J-A20014-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TORRIANO BEARD, | |
| Appellant | No. 808 WDA 2017 |

Appeal from the Judgment of Sentence Entered February 28, 2017
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-25-CR-0001932-2016

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED NOVEMBER 13, 2018**

Appellant, Torriano Beard, appeals from the judgment of sentence of life imprisonment, imposed after he was convicted of first-degree murder and related offenses.  On appeal, Beard challenges, *inter alia*, the trial court's decision to allow the admission, for impeachment purposes, of a statement he made to police.  After careful review, we conclude that there are factual and legal determinations that must be made by the trial court regarding the voluntariness of that statement.  Therefore, we vacate Appellant's judgment of sentence and remand for an evidentiary hearing.

Briefly, Appellant was convicted based on evidence that in the early morning hours of February 14, 2016, he and a cohort, Antonio Barnes, shot and killed Jemar Phillips in the parking lot of a bar.  After a 4-day jury trial, Appellant was found guilty of first-degree murder, criminal conspiracy to

commit murder, aggravated assault, recklessly endangering another person, possessing an instrument of crime, and carrying a firearm without a license. On February 28, 2017, Appellant was sentenced to life imprisonment without the possibility of parole. He filed a timely post-sentence motion, which was denied. Appellant thereafter filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed a Rule 1925(a) opinion on November 21, 2017.

Herein, Appellant presents three questions for our review, which we have reordered for ease of disposition:

1. Did the trial court abuse its discretion when it denied Appellant's motion for a new trial as the convictions were against the weight of the evidence?

2. Did the trial court err when it ruled that a prior incident, in which Appellant allegedly fired a gun at Phillips, was admissible under Pa.R.E. 404(B), where the Commonwealth could not establish that Appellant had actually perpetrated the prior act and where the potential for prejudice was extremely high?

3. Did the trial court err when it ruled that the Commonwealth could impeach Appellant with the confidential statement he made when this proposed use contravened the plain language of the agreement that it would not be utilized against him?

Appellant's Brief at 8 (unnecessary capitalization omitted).

We begin with Appellant's challenge to the weight of the evidence to sustain his convictions.

A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the

- 2 -

weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations and internal quotation marks omitted).

Initially, the trial court concluded that Appellant waived his weight claim by not setting it forth with sufficient specificity in his Rule 1925(b) statement. *See* Trial Court Opinion (TCO), 11/21/17, at 19. In that statement, Appellant declared: "The trial court erred when it did not find that Appellant's convictions for first-degree murder, criminal conspiracy, aggravated assault, recklessly endangering another person, possessing an instrument of crime, and firearms not to be carried without a license were contrary to the weight of the evidence." Pa.R.A.P. 1925(b) Statement, 8/9/17, at 2 ¶ 2 (pages unnumbered). However, as Appellant points out, in his post-sentence motion, he more specifically averred that the verdict was contrary to the weight of the evidence because:

46. No statement by [Appellant] was ever introduced at trial.

47. The jury's verdict was based on pure conjecture and speculation after viewing the surveillance video and ignoring the testimony given in [c]ourt and the objective facts that the murder weapons were never possessed by [Appellant].

48. There was no forensic evidence linking [Appellant] to the firearms used in the shooting or to the shooting itself.

- 3 -

Post-Sentence Motion, 3/10/17, at 6 ¶¶ 46-48.  We agree with Appellant that his post-sentence motion conveyed to the court what weight-of-the-evidence arguments he would raise on appeal and, therefore, we decline to find waiver based on his more general phrasing of the issue in his Rule 1925(b) statement.

Nevertheless, we conclude that Appellant is not entitled to relief based on this claim.  The trial court summarized the evidence presented at Appellant's trial, as follows:

### Antonio Barnes -Trial Testimony

The Commonwealth presented the testimony of Antonio Barnes, whose relevant testimony is summarized as follows.

Late on February 13, 2016, Jemar Phillips and Antonio Barnes left a local bar together in a gold Honda SUV operated by Jemar Phillips.  They stopped and picked up Rejeana Durr, an acquaintance of Phillips.  Phillips drove east along West 18th Street to Angie's Last Stop bar, a/k/a Ray's Last Stop bar.  Angie's is located on the southeast corner of the intersection of 18th and Raspberry Streets in Erie, Pennsylvania.

Phillips pulled into the parking lot directly across the street from the bar and parked facing east on the east side of the lot. After a slight delay, Barnes exited the vehicle and Phillips followed. As Barnes and Phillips reached the back of the SUV, Barnes observed two to three black males walk from the parking lot entrance into the parking lot toward them.  The black males had guns and started shooting at them.  Barnes and Phillips ran.  Each fell down more than once on the icy surface of the lot as they ran between and around parked cars trying to escape.  Once when Barnes fell, he mistakenly thought he was shot and called 911 from his cell phone.  Barnes heard two distinctly different sounds of guns being fired.

When the shooting subsided, Barnes found Phillips dead on the ground in between two parked vehicles in the lot.  He remained with Phillips until the police arrived.

Barnes did not specifically identify any shooter. He told the police he could not and would not "testify on nobody."

Barnes' trial testimony established [that] two to three black males shot different weapons at Phillips and Barnes in the parking lot across the street from the bar, and Phillips died at the scene.

**Rejeana Durr - Testimony**

The Commonwealth presented the testimony of Rejeana Durr. To place Durr's trial testimony in context, during the criminal investigation, Durr had contact with the police on at least three occasions: February 14, 2016, February 22, 2016 and February 29, 2016. On February 14, 2016 and February 29, 2016, Durr gave recorded interviews. On February 29, 2016, Durr also signed a written statement prepared by the police from notes taken during Durr's interview on February 22, 2016. On February 22, 2016, Durr identified Appellant from a photograph lineup as one of the assailants. During Durr's trial testimony, the [c]ourt granted the Commonwealth's request to treat Durr as a hostile witness.

Durr's relevant trial testimony (including admissions about her prior statements) and evidence submitted during her testimony are summarized herein.

Durr was one of two passengers in Phillips' vehicle when Phillips entered the parking lot. Antonio Barnes was the other passenger. Altogether, there were five persons in the parking lot when Phillips was murdered: Phillips, Durr, Barnes, and two black males with guns. One of the guns was described as a "cowboy gun." Phillips was approached by the two men with guns and was shot and killed in the parking lot. When Durr heard the first shot, she was afraid and ran toward Raspberry Street into the bar.

Video surveillance depicts Durr running across 18th Street at the intersection, and hurrying into the bar. The video surveillance was admitted in evidence as Commonwealth Exs. 8-9. The male (later identified as Appellant) who followed Durr into the bar after the shooting also followed Durr as she exited the bar.

Durr admitted that on February 14, 2016, about an hour after the incident, she gave the police her first recorded interview about the incident. The video[-]recorded interview of February 14, 2016 was played for the jury and admitted in evidence as Defendant Ex. A.

Durr admitted that on February 22, 2016, she was interviewed by Detectives Lorah and Stoker at her residence. She identified Appellant from a photograph lineup as the shooter who was wearing a "red vest[."] The photograph lineup with Durr's identification of Appellant was admitted in evidence as Commonwealth Ex. 6.

Durr admitted that on February 29, 2016, she went to the police station to retrieve her cell phone and spoke with Detective Lorah about the incident. She signed a written statement prepared from information Durr had supplied to the police on February 22nd as to the identity of Appellant and the events she witnessed at the scene. Durr's written statement was admitted in evidence as Commonwealth Ex. 5. Durr admitted that in the written statement she informed the police it was the male with the red vest who had the "cowboy gun." On February 29, 2016, Durr also provided her second recorded interview about the incident. The video of the recorded interview of February 29, 2016[,] was played for the jury and admitted as Commonwealth Ex. 7. On February 29, 2017, Durr told the police she was afraid for her safety on account of the incident. She informed detectives that while she was in Phillip's car she saw males reaching for something in their car, and the males subsequently approached Phillips' car with guns.

Durr admitted she informed Detective Lorah [that] one of the males (later identified as Appellant) unloaded a gun, meaning he fired a lot of shots. She admitted reporting to detectives she did not get a good look at the male with the second gun, though he appeared lighter skinned than the male who wore the red vest.

**Eric Vey, M.D., Forensic Pathologist -Trial Testimony**

Dr. Vey conducted an autopsy of the victim on February 14, 2016. The autopsy revealed Phillips was shot eight times. All shots were short range, made from a distance of one and one-half to two feet from the victim. Vey concluded Phillips died from multiple gunshot wounds to the torso.

Six bullets and some bullet fragments were recovered during the autopsy. The bullets and bullet fragments were turned over to the police for testing.

**The Police Investigation -Trial Testimony**

Various police officers testified to the results of ballistics testing, the weapons used in the shooting, statements made by Regina Durr after the shooting implicating Appellant and Appellant's presence at the crime scene as depicted in surveillance videos and Appellant's unusual attire at the time of the murder.

The police identified Appellant as the perpetrator based upon Durr's description of Appellant's clothing at the time of the murder, surveillance videos from various locations on February 13, 2016 and February 14, 2016, and Durr's identification of Appellant from a photo lineup. Further, police discovered a Facebook video of Appellant posted on February 13, 2016, which depicts Appellant in a white Mercedes, the same vehicle as depicted in surveillance videos, wearing the outfit as described by Durr and as depicted in surveillance videos.

The relevant testimony and evidence regarding the investigation by police are summarized as follows.

### 1. Ryne Rutkowski, Erie County Department of Public Safety, 911 Call Center

On February 14, 2016 at approximately 1:00 a.m., the 911 call center received two telephone calls reporting shots fired at/near 18th Street and Raspberry Streets. A representative from the 911 Center called one of the callers back for additional information. Recordings of the three telephone conversations were played for the jury and admitted collectively as Commonwealth Ex. 2.

### 2. Corporal Michael Brown, Erie Bureau of Police

On February 14, 2016, Corporal Brown was dispatched to the scene at approximately 1:00 a.m. on the report an individual was shot in the parking lot north of Angie's Last Stop bar. Brown arrived within minutes and was approached by Antonio Barnes who said his friend had been shot. Brown located the victim on the ground between two parked cars. Paramedics confirmed the victim was dead. Antonio Barnes and a black female (later identified as Rejeana Durr) were taken to patrol cars and transported to the Erie Police Department.

### 3. Detective Sergeant Kenneth Kensill, Erie Bureau of Police

Detective Kensill assisted in securing the scene. He also assisted in the collection of evidence, which included shell casings

and one bullet recovered from the scene, and items recovered during victim's autopsy[,] which Kensill attended. Items recovered during the autopsy included a cell phone, a bullet or bullet fragment in the victim's pocket, and bullets recovered from the body. A .45 caliber bullet was recovered from the victim's thigh and .38 caliber bullets were removed from his torso. Kensill also collected video surveillance evidence including video surveillance from the bar and from a car impound lot down the street.

One of the weapons used in the shooting, a .357 Magnum, was recovered from Lavance Kirksey in a separate incident. The other weapon, a Hi-Point .45 caliber semiautomatic, was seized from a third party in a separate incident.

### 4. Corporal David J. Burlingame, Pennsylvania State Police

Corporal Burlingame, a forensic firearm and toolmark examiner, examined the ballistics evidence submitted for review. He also examined two weapons recovered in separate incidents months after the shooting: a .357 Smith and Wesson Magnum revolver and a .45 caliber Hi-Point semi-automatic handgun. Burlingame determined both weapons were used in this incident. He confirmed the two types of weapons sound differently when fired.

### 5. Detective Craig Stoker, Erie Bureau of Police

Appellant did not have a valid license to carry firearms on the date of the homicide, nor did he have a valid sportsman's firearm permit.

There were two guns used in the shooting on February 14, 2017: a .357 Magnum and a Hi-Point .45 caliber semi-automatic [handgun]. These two guns were recovered in separate incidents months after the shooting and determined to be the guns used in the shooting of Phillips through ballistics testing.

### 6. Captain Rick Lorah, Erie Bureau of Police

On March 2, 2016, Appellant was charged in the homicide of Phillips. The next day, on March 3, 2016, the fugitive task force went to Appellant's residence to arrest him. When the police learned Appellant was not present, they obtained a search warrant for his residence. During the search, the police recovered clothing

consistent with clothing Appellant was wearing the night of the shooting.

Appellant was arrested on March 15, 2016.

Lorah testified extensively about the investigation[,] which led to Appellant's arrest. The investigation produced a timeline of Appellant's travels the night of February 13, 2016, and into the early morning hours of February 14, 2016. Much of Appellant's activity at relevant times [was] captured on video surveillance recovered from various establishments.

Appellant went to several bars the evening of February 13, 2016. His last stop on February 13th, before heading to Angie's bar was to another bar, Slugger's. At approximately midnight on February 13th, Appellant was filmed by a surveillance camera in the parking garage at Tenth and State Streets near Slugger's. A still image from the surveillance video was shown to the jury and admitted in evidence as Commonwealth Ex. 48. The image depicts Appellant in the parking garage with Lavance Kirksey. Two other persons depicted with Appellant in the film were Rather Freeman and Constance Johnson. Appellant was dressed in white, and a fur garment. The police determined Appellant was traveling in a white, two-door luxury sports vehicle that evening.

During the investigation, the police obtained a video of Appellant posted on Facebook which depicted Appellant inside the same white sports vehicle wearing a vest which appeared to be the same vest Appellant wore the night of the homicide. The vest in the Facebook video and the vest Appellant was wearing when he entered Angie's immediately following the homicide had the same details: they had the same fur stripes, collar and cut. The Facebook video was played for the jury and admitted in evidence as Commonwealth Ex. 49.

The police obtained surveillance video from the exterior of Angie's bar. The video camera captured the view of the front entrance of Angie's, the intersection of 18th and Raspberry Streets, and portion of the parking lot bordering 18th Street, across the street from the bar. No video surveillance captured the "heart" of this parking lot where the murder occurred.

The video from the exterior of Angie's was played for the jury and admitted in evidence as Commonwealth Ex. 8. As narrated by Captain Lorah, the video depicts Appellant pulling up outside of Angie's in a white, two-door Mercedes with Lavance Kirksey,

Rather Freeman and Constance Johnson, the same individuals depicted with Appellant in the surveillance video from the parking garage at Tenth and State Street near Slugger's. Appellant, wearing white pants, is seen milling around outside the Mercedes with the three others. The victim's vehicle pulls into view, past Appellant and the others, and turns into the parking lot. The victim's vehicle continues in the lot out of the view of the camera. Appellant walks into the parking lot, and out of the range of the camera. At some point during this, Johnson is seen entering the bar. Freeman and Kirksey re-approach the Mercedes. Freeman then follows Johnson into the bar. Kirksey walks into the parking lot, and out of the range of the camera.

A vehicle heading west on 18th Street pulls up to the intersection of 18th and Raspberry Streets and stops. Durr is viewed running from the parking lot, across the street in front of the stopped vehicle, and into the bar. The operator of the stopped vehicle was one of the persons who called 911. The video depicts Appellant following Durr into Angie's. Appellant is wearing a red fur coat with the same lines as depicted in the Facebook video.

The video from the exterior of Angie's further depicts Durr exiting the bar and heading back toward the homicide scene. Appellant is viewed exiting the bar and walking past his vehicle. Appellant returns to the Mercedes and leaves the scene with Kirksey, Johnson and Freeman shortly before the police arrive.

Surveillance recorded from various angles within Angie's bar at relevant times, Commonwealth Ex. 9, was played for the jury. The video depicts Durr entering the bar, heading to the back of the bar, returning to the front of the bar, and exiting through the front entrance. Appellant is shown entering the bar behind Durr, meeting up with another person, and exiting shortly after Durr exits the bar.

Video surveillance from Eddie's Collectibles, a nearby impound lot, also places Appellant at the scene of the crime and shows Appellant and Kirksey leaving the scene in the white Mercedes before the police arrived. The video depicts Appellant in white pants and Kirksey walking toward where Phillips[] had headed … [when] the homicide occurred. Durr is viewed running in front of the vehicle of the person who called 911. Durr is viewed running into the bar. Kirksey returns to the white Mercedes. Appellant is viewed walking into the bar after Durr. Durr is viewed running back toward the parking lot.

Lorah testified that Durr told Lorah the person who killed Phillips followed her into the bar, and followed her back outside. Lorah further testified that on February 22, 2016, Durr told the police the male with the red vest and white thermal pushed past Barnes and unloaded a cowboy gun into Phillips. At that time, Durr also told Lorah about the red vest.

Based upon the police investigation, Lorah identified Appellant as the person in the video who followed Durr into the bar. Appellant was wearing either white or light colored pants, a white thermal undershirt and a red vest at the time.

TCO at 4-14 (citations to the record omitted).

On appeal, Appellant argues that the weight of the above-summarized evidence does not support any of his convictions for several reasons. Specifically, he avers that "the 'eyewitness' testimony came from individuals that either could not remember important details, were impaired by drugs or alcohol, or were utterly incapable of providing a consistent account of what happened or who was involved in the homicide." Appellant's Brief at 34-35. Additionally, he maintains that "the scientific evidence presented did not support the Commonwealth's theory and did not link Appellant to the crime." *Id.* at 35.

In rejecting Appellant's weight claim, the trial court concluded (in an alternative analysis after deeming the issue waived) that Appellant's contentions merely raised credibility issues, which "are within the province of the jury." TCO at 20 (citing, *inter alia*, **Commonwealth v. Smith**, 861 A.2d 892, 896 (Pa. 2004)). The court determined that "[t]he jury's verdicts do not shock one's sense of justice" and "were amply supported by the evidence, as

summarized herein." ***Id.*** We discern no abuse of discretion in the court's decision.[1]

Appellant next challenges the trial court's pre-trial ruling that the Commonwealth could admit prior bad act evidence. The admission of such evidence is governed by Pennsylvania Rule of Evidence 404(b), which states:

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

_____

[1] During the pendency of this appeal, Appellant filed a "Motion for Correction or Modification of Certified Record Pursuant to Pa.R.A.P. 1926[,]" alleging that the Commonwealth had failed to include all of the trial exhibits in the certified record, and asking that we direct the Commonwealth to submit Exhibits 42, 44, and 46-50. Appellant claimed that such exhibits were necessary for this Court to review his challenge to the weight of the evidence, yet he did not cite to or discuss any of those exhibits in his appellate brief. He also did not identify any way in which the court's above-quoted summary of the evidence presented at trial was inaccurate. Consequently, we do not deem the at-issue exhibits necessary for our review of Appellant's weight-of-the-evidence claim, and we deny his "Motion for Correction or Modification of Certified Record Pursuant to Pa.R.A.P. 1926."

Instantly, Appellant summarizes the evidence that the Commonwealth sought to admit, as well as the arguments presented by the parties for and against its admission, as follows:

Prior to trial, the Commonwealth filed a motion to introduce prior bad acts evidence under Pa.R.E. 404(b). Specifically, the Commonwealth sought to introduce the testimony of Appellant's cousin (referred to … alternative[ly] as Teresha or Terricia Beard) that, approximately one and one-half months prior to the homicide, she witnessed Appellant shooting at Phillips while Phillips was seated in her vehicle in the driveway of her residence…. The Commonwealth sought to introduce this testimony under the "*res gestae*" or "complete story" exception[,] or under the theory that it would show Appellant's plan, motive, malice and ill-will.

At the pre-trial hearing, the Commonwealth advised that ballistics testimony linked the gun utilized in the shooting to the gun utilized in the instant homicide. Further, Phillips sat in the same car in Ms. Beard's driveway that he drove to Angie's Last Stop on the night of the homicide. The Commonwealth admitted that Ms. Beard did not identify Appellant as the shooter when the police arrived at her home at 2:30 a.m.

The defense contended that Ms. Beard's inability to identify Appellant that night, instead describing him to police as a "tall, skinny, black male[,"] made the incident of no probative value to the instant homicide case. Further, the defense contended that the only person originally charged in connection with the original shooting incident was Ms. Beard herself, who obtained charges for possession of crack cocaine. Even further, the defense contended that the police discovered the .45 caliber firearm, allegedly utilized in the shooting and in the homicide, in the possession of a third person, Saint Martin Ellman, in June of 2016. Mr. Ellman entered a plea to possession of the firearm. Finally, the defense emphasized the highly prejudicial nature of this evidence.

In rebuttal, the Commonwealth emphasized that Ms. Beard could testify to the "beef" between Phillips and Appellant. The Commonwealth also argued that Appellant could have possessed the gun prior to the discovery of it on Ellman's person. Further, the Commonwealth proffered that an eyewitness to the homicide[,

Durr,] heard the victim say, "there go the nigger that shot me." Defense counsel reminded the [c]ourt that Phillips could not have observed the shooter from the first incident as the police report indicated that Phillips was passed out drunk at the time. After argument, the [c]ourt reserved ruling. On the following day, the trial court filed a written order granting the Commonwealth's request.

Appellant's Brief at 47-49 (citations to the record omitted).

On appeal, Appellant argues that the admission of Ms. Beard's testimony was impermissible and highly prejudicial. However, he also recognizes that the Commonwealth never actually called Ms. Beard to the stand. Instead, the only references to the at-issue, prior-bad-acts evidence were made during the Commonwealth's opening statement, and in the testimony of Rejeana Durr. First, in the Commonwealth's opening statement, the prosecutor remarked:

And when you're asked to judge the evidence in this case, I ask you to return a verdict of guilty for first[-]degree murder. And that this killing, when we present the evidence to you of a prior incident on January 3rd which Teresha Beard will testify … that she was present with Jamar Phillips, and that's how we know that [Appellant] knew the vehicle when it pulled into the parking lot. Similarly, ballistic evidence from the January 3rd case or incident, matches the ballistic evidence from February 14th, that [Appellant's] decision was a deliberate and willful decision to walk over and confront Jamar Phillips on February 14th and that was a deliberate and willful decision.

*Id.* at 50-51 (quoting N.T. Trial, 1/18/17, at 14). Later, during Durr's testimony, "the Commonwealth … introduce[d] Durr's recorded statements into evidence, which made reference to Phillips' alleged statement: 'there's the nigger that shot me.'" *Id.* at 51 (citing N.T. Trial, 1/18/17, at 51). "In this recorded statement, Durr also explain[ed] that Phillips told her that he had been shot on a prior occasion." *Id.* (citing N.T. Trial, 1/18/17, at 51).

- 14 -

In light of this record, Appellant contends that,

the Commonwealth made a prejudicial reference in its opening [statement] linking Appellant to a prior incident involving the victim, with matching ballistics to the instant shooting, but never called this witness. The Commonwealth then proceeded to present evidence from Durr (who did not witness the prior incident) as to statements made by the victim in the moments before the homicide and to her on another occasion about a prior shooting. By doing so, the Commonwealth never presented a single witness who could be effectively cross-examined to test the credibility of the prior report of Appellant's involvement. This deviated from the Commonwealth's pre-trial proffer about how this link would be established at the time of trial and resulted in the jury['s] hearing prejudicial, untestable evidence linking Appellant to the prior incident.

*Id.*

Appellant's argument on appeal does not entitle him to relief. Appellant does not specifically explain why the court's decision to admit Ms. Beard's testimony concerning his prior bad act of shooting Phillips was erroneous. Instead, he contests the Commonwealth's mentioning her testimony in its opening statement and then not calling her to the stand, as well as the admission of Durr's statements about the prior shooting, on the basis that these mentions of the prior shooting "deviated from the Commonwealth's pre-trial proffer…." *Id.* Notably, however, Appellant did not object to the portions of Durr's pre-recorded statement that mentioned his prior bad acts; therefore, he cannot now challenge the admission of that evidence on appeal. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, the Commonwealth's vague remarks about the prior incident in its opening statement did not

constitute evidence, and the jury was instructed as much. ***See*** N.T. Trial, 1/20/17, at 93 (the court's informing the jury that "the speeches of counsel are not to be considered as part of the evidence and please do not consider them as such"). We presume that the jury followed the court's instructions. ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1147 (Pa. 2011) (citation omitted). Consequently, Appellant has failed to demonstrate that he is entitled to relief based on the court's pre-trial ruling to admit Ms. Beard's testimony about his prior bad acts, where Ms. Beard was never called to the stand at trial.

In Appellant's final issue, he challenges another pre-trial ruling by the trial court to admit certain evidence. Appellant explains the context of his claim, as follows:

> Defense counsel filed a Motion *In Limine* asking the trial court to exclude a confidential statement made by Appellant to assistant district attorneys and detectives concerning the events surrounding Phillips' homicide[,] as the parties agreed prior that the statement could not be used against him. In the presence of his counsel, Appellant spoke to provide the Commonwealth with evidence that would tend to exonerate him and implicate a third party, Kirksey, in the homicide. The Commonwealth agreed to further investigate any leads and to not utilize the statement against Appellant. The statement was eventually summarized by police in an incident report and was not recorded per the parties' agreement.
>
> In response to Appellant's Motion *In Limine*, the Commonwealth took the position that it would not utilize the statement as evidence unless Appellant testified at trial and his testimony differed from the statement. Ultimately, the [c]ourt determined that the Commonwealth could impeach Appellant with the statement if Appellant elected to testify.

- 16 -

Appellant's Brief at 38-39 (citations to the record omitted).

Appellant now contends that the trial court's decision to allow the Commonwealth to use his statement for impeachment purposes violated the parties' agreement that the statement would not be used against him. Specifically, the parties' agreement, which was memorialized in the incident report, read as follows:

> We agree[d] that anything [Appellant] told us would not be used against him and that the interview would not be recorded and he was not read his ***Miranda***[2] Rights.

N.T. Trial, 1/17/17, at 18-19 (the trial court's reading from the incident report). As Appellant stresses, "[a]t the hearing, the parties differed on the interpretation of what [`]*not using the statement against Appellant*['] meant with the defense asserting that it could not be used in any circumstance and the Commonwealth asserting that it could not be used in its case-in-chief, but could be used in the event Appellant testified and his testimony diverged from the statement." Appellant's Brief at 40-41 (emphasis in original). Ultimately, the trial court agreed with the Commonwealth, a decision which Appellant argues was erroneous.

We initially point out that in its opinion, the trial court rejects Appellant's challenge to its pre-trial ruling, essentially deeming the issue moot because "Appellant did not testify at trial" and, thus, his statement was not admitted into evidence. TCO at 22. We agree with Appellant that the "court overlooks

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

that the resolution of pretrial motions can impact a defendant's decision to testify at trial and his attorney's advice about whether to take the stand." Appellant's Brief at 45 (citing **Commonwealth v. Cascardo**, 981 A.2d 245, 252 n.3 (Pa. Super. 2009) (assessing a claim that the trial court erred in its pre-trial ruling to admit, for impeachment purposes, certain prior convictions if Cascardo took the stand, where Cascardo claimed that the ruling impacted his decision not to testify)).  Appellant claims that here, the court's ruling influenced his decision not to testify.  Accordingly, we must assess the court's decision on this pre-trial matter.

Appellant presents various arguments to support his claim that the trial court erred in deeming his statement admissible for impeachment purposes. For instance, he urges this Court to adopt a standard applied in "federal court jurisprudence" in the context of "[p]re-trial agreements, such as cooperation agreements and proffer agreements…."  Appellant's Brief at 39-40 (citing **United States v. Liranzo**, 944 F.2d 73, 77 (2nd Cir. 1991)).  He also argues that his statement should be treated similarly to statements made during the course of plea negotiations, which are inadmissible pursuant to Pa.R.E. 410. Appellant further contends that we should apply "basic principle[s] of contract law" and hold that under "the plain language of the agreement[,]" the Commonwealth could not admit Appellant's statement for any purpose at trial. **Id.** at 44.

Appellant's arguments miss the mark.  Instead, we conclude, based on the limited record before us, that the circumstances here are more akin to a

statement taken in violation of *Miranda*.  Such statements are still admissible for impeachment purposes, as long as they were voluntarily given.  *See* PA. CONST. Art. 1, § 9 ("The use of a suppressed *voluntary* admission or *voluntary* confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.") (emphasis added); *Commonwealth v. Busanet*, 54 A.3d 35, 39 (Pa. 2012) ("[R]egardless of whether the challenged statement was obtained in violation of *Miranda*, it would not be subject to suppression … for the limited purpose of impeaching [the a]ppellant's testimony.").

In regard to assessing the voluntariness of Appellant's statement, we find *Commonwealth v. Templin*, 795 A.2d 959 (Pa. 2002), instructive. There, the interviewing officer told Templin that he would recommend that Templin be released on his own recognizance (ROR) if Templin admitted to any of the criminal conduct for which he was being investigated.  *Id.* at 963. Templin then provided an inculpatory statement to the officer.  *Id.*  On appeal, Templin argued that "the officer's post-*Miranda* waiver promise to recommend ROR release at arraignment was an offer of leniency in the prosecution of the case which rendered his confession involuntary as a matter of law, irrespective of the totality of the circumstances."  *Id.* (internal quotation marks omitted).  In rejecting this argument, our Supreme Court held "that the voluntariness of a confession is determined by the totality of the circumstances."  *Templin*, 795 A.2d 963-64.  The Court further explained that:

In determining voluntariness, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. "By the same token, the law does not require the coddling of those accused of crime. One such need not be protected against his own innate desire to unburden himself." *Commonwealth v. Graham*, 408 Pa. 155, 162, 182 A.2d 727, 730–31 (1962). Factors to be considered in assessing the totality of the circumstances include the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Templin*, 795 A.2d at 966 (some internal quotation marks and citations omitted). Finally, the *Templin* Court stressed that it "has applied the totality of the circumstances with no less force or vigor in cases where there was a claim that a promise or inducement rendered the confession involuntary." *Id.* at 964 (citation omitted).

Here, Appellant contends that his statement was inadmissible, even as impeachment evidence, because the parties agreed that the statement would not be used against Appellant in court. We view this claim as essentially an argument that Appellant's statement was involuntary because it was induced by a false promise made by the detective(s) and the prosecutor. However, as our Supreme Court made clear in *Templin*, the agreement between the parties is but one factor in assessing the voluntariness of Appellant's statement under the totality-of-the-circumstances test. In ruling that Appellant's statement was admissible for impeachment purposes, the trial court made no factual findings or legal conclusions regarding the voluntariness

- 20 -

of Appellant's statement, and the record is devoid of any facts that would permit us to make that legal determination in the first instance. **See id.**, 795 A.2d at 961 ("The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review."). For example, it is unclear when or where Appellant's statement was given, whether he was detained at the time (and the conditions thereof), how long the interview/interrogation lasted, who was present during it, and what Appellant's physical and psychological states were when he provided the statement. Indeed, we do not even know what Appellant said in his statement, or if it was inculpatory. It is also unclear whether **Miranda** warnings were provided and, if so, whether they were validly waived.[3]

Therefore, because we cannot discern, based on this record, whether Appellant's statement was voluntary, such that it was admissible impeachment evidence, we must vacate Appellant's judgment of sentence and remand for a hearing. At that proceeding, the trial court shall make factual determinations regarding the circumstances of Appellant's statement to police. The court must then decide, under the totality of those circumstances (including the agreement reached by the parties), whether Appellant's

_____

[3] The Commonwealth contended at the pre-trial hearing that Appellant was provided with **Miranda** warnings and signed a written waiver of those rights, despite that the incident report indicated that **Miranda** warnings were not provided. **See** N.T. Trial, 1/17/17, at 18. It is not clear if the trial court examined a **Miranda** rights waiver form, and the court made no explicit factual finding on whether **Miranda** warnings were provided to Appellant, nor any legal determination on whether they were validly waived.

statement was voluntary. If the court determines that it was not, and therefore the statement is inadmissible for impeachment purposes, then the court shall order a new trial. If, on the other hand, the court finds that Appellant's statement was voluntary, and admissible for impeachment purposes as it originally ruled, then the court shall re-impose Appellant's judgment of sentence. Appellant may then file an appeal, limited to issues concerning the court's decision on remand.

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2018